Upon review of the competent evidence of record with respect to the errors assigned, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner.
***********
 STIPULATIONS
1. All stipulations contained in the Pre-Trial Agreement are received into evidence.
2. An index of medical records marked as stipulated exhibit 1 was received into evidence.
3. Subsequent to the hearing before the Deputy Commissioner, a set of medical records from Dr. McQueen was marked as stipulated exhibit 2 and received into evidence.
4. Subsequent to the hearing before the Deputy Commissioner, a Form 22 was marked as stipulated exhibit 3 and was received into evidence.
***********
Based upon all of the competent evidence adduced from the record, the Full Commission rejects the findings of fact found by the Deputy Commissioner and enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a forty-six year old female with a high school education. She had been employed as a manual packager by defendant for twenty-two years and as an automatic packager for one year prior to going out of work.
2. Plaintiff had a pre-existing condition that had caused her to have seizures prior to 8 June 1993. Plaintiff first began having seizures when she was in her early twenties. By 1985, plaintiff's seizures were under control through the consistent use of medications, and she did not have anymore episodes from 1985 to 1993.
3. On 8 June 1993, plaintiff was working as an automatic packager on the third shift when she went to the company canteen for some ice cream. Plaintiff slipped on a wet floor inside the canteen, injuring her neck, right shoulder and right leg.
4. Following the 8 June 1993 slip and fall, the company nurse directed plaintiff to obtain treatment from Dr. Arenas. Plaintiff complained of neck, back and buttock pain, and reported that she had fallen and landed on her back and her buttocks, then fell backwards and hit her head. She did not report a headache, vomiting or loss of consciousness. Dr. Arenas did observe a contusion on plaintiff's left side of her head. Plaintiff began a course of conservative treatment under the direction of Dr. Arenas that included wearing a prescribed neck brace and collar as well as ingesting muscle relaxants. On 11 June 1993, Dr. Arenas released plaintiff to light duty work.
5. A 8 June 1993 x-ray of plaintiff's skull did not reveal any fractures.
6. No evidence was presented that would support a finding that plaintiff experienced a brain hemorrhage following the 8 June 1993 slip and fall.
7. Pursuant to the directions of the defendant on 20 July 1993, plaintiff began a course of treatment under Dr. Mark E. Brenner. During the course of his treatment of plaintiff, Dr. Brenner directed plaintiff to continue to do light duty work even though he was able to objectively verify that she had swelling in her right knee and that a knot had appeared on her neck. During the course of her treatment by Dr. Brenner, plaintiff started experiencing headaches and continued to experience pain in her neck and right shoulder.
8. Three months after the 8 June 1993 slip and fall, plaintiff started experiencing minor seizures. At first plaintiff would just stare for five minutes. After six months, her seizures became so bad that she would fall on the floor and bite her tongue.
9. On 22 July 1993, plaintiff sought medical treatment from her family physician, Dr. McQueen. Dr. McQueen initially instructed plaintiff to follow the treatment plan adopted by Dr. Brenner. However, on 21 October 1993 Dr. McQueen restricted plaintiff from returning to any work as a result of the injuries she sustained from the 8 June 1993 slip and fall.
10. On 19 November 1993, plaintiff reported to Dr. McQueen that she had begun to experience seizures again. Dr. McQueen expressed his concern about plaintiff working around machinery given the return of these seizures.
11. On 2 June 1994, Dr. McQueen agreed to allow plaintiff to return to work without restrictions as had been directed by Dr. Brenner.
12. By 28 November 1994, plaintiff had begun to experience escape seizures. These escape seizures were seizures that were escaping beyond the control of the therapeutic regiment that had been prescribed at about that time. Plaintiff never had these type of seizures prior to the 8 June 1993 slip and fall. Dr. McQueen referred plaintiff to a neurologist.
13. On 30 November 1994, plaintiff presented to neurologist and brain specialist, Dr. Jack L. Young. Dr. Young treated plaintiff for her seizures with various medications through 22 August 1995. He concluded that plaintiff's seizures were idiopathic, without any specific cause.
14. On 2 February 1995, Dr. McQueen restricted plaintiff from returning to work with defendant because of her seizure disorders.
15. Dr. McQueen continued to treat plaintiff while she was seeing Dr. Young and continuing through September 1996. Dr. McQueen believes plaintiff's seizure activity was aggravated by her slip and fall on 8 June 1993, but bases his diagnosis solely on the fact that her seizure activity increased after the fall.
16. Neurologist Dr. Bradley V. Vaughn examined plaintiff on 28 September 1995. Dr. Vaughn stated that he did not have enough information in regards to the 8 June 1993 fall to make an accurate determination of whether it had an impact on plaintiff's seizures. However, he noted that, in order for head trauma to be an accepted cause of epilepsy, the trauma generally must be severe enough to cause loss of consciousness for greater than 24 hours, hemorrhaging into the brain, or a skull fracture. Dr. Vaughn also opined that it is very common for people with epilepsy to experience a period of no seizures and a positive response to medication, followed by a recurrence of the condition and a lack of positive response to the same medication.
17. On 28 February 1997 plaintiff was interviewed by neurologist Dr. Steven Freedman. Dr. Freedman conducted a forty-five minute interview with plaintiff and her husband and examined the records of Drs. Arenas and McQueen. Dr. Freedman agreed with Dr. Vaughn's statements regarding the general necessity of having a loss of consciousness, hemorrhaging or a skull fracture to bring on epileptic seizures, and that it was not unusual for people with the condition to experience a period without seizures. He also stated that the overwhelming majority of cases in which a recurrence of seizures was experienced, the onset of seizures was idiopathic with no known cause. Further, as time passes between the head trauma and the recurrence of seizures, the likelihood of a causal relationship is reduced. Specifically, he stated that "several months is sort of stretching it." Despite this testimony, Dr. Freedman opined that he thought plaintiff's condition was probably aggravated by her fall, but admitted that there was no way to prove it and he based his conclusion on no more than a "gut clinical sense" without supporting medical evidence.
18. There is insufficient competent evidence to support the conclusion that the recurrence of plaintiff's seizures is causally connected to the slip and fall which occurred on 8 June 1993.
19. Plaintiff has reached maximum medical improvement with regard to her neck, right shoulder and right leg pain resulting from the 8 June 1993 slip and fall.
20. Plaintiff was released to return to light duty work on 11 June 1993. She was written back out of work on 21 October 1993 by Dr. McQueen for seizure problems not related to her 8 June 1993 slip and fall accident. Any missed work time after 21 October 1993 was not related to plaintiff's 8 June 1993 slip and fall accident.
***********
Based upon the foregoing findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 8 June 1993, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant. G.S. § 97-2(6).
2. There is insufficient competent medical evidence to support the conclusion that plaintiff's subsequent recurrence of seizures is causally related to her 8 June 1993 slip and fall accident; therefore, plaintiff is not eligible to receive compensation under the Act for medical treatment or lost work time due to her seizures. G.S. § 97-2(6).
3. Plaintiff is entitled to have defendant pay for all medical expenses incurred by plaintiff as a result of her compensable back, shoulder, and right leg injuries resulting from the 8 June 1993 slip and fall, to the extent that these expenses are reasonably required to effect a cure, give relief or lessen the period of disability. G.S. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for disability compensation as a result of the recurrence of seizures is denied.
2. Defendant shall pay for all medical expenses incurred by plaintiff as a result of the 8 June 1993 injuries to her back, shoulder and leg.
3. Defendant shall pay an expert witness fee in the amount of $215.00 to Dr. Brenner, $140.00 to Dr. Arenas, $140.00 to Dr. McQueen and $175.00 to Dr. Vaughn.
4. The parties shall divide the costs of this action.
 S/_____________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER
RCR:jbd